**Lillie M. MONROE–LORD and Lois M. Smith,**

v.

**William P. HYTCHE, et al.**

**Civ. No. Y–85–3083.**

United States District Court,
D. Maryland.

Aug. 19, 1987.

Susanne K. Henley, and Alan Hilliard Legum, Annapolis, Md., for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen. for the State of Md., Baltimore, Md., James Mingle and W. Carter Lester, Jr., Asst. Attys. Gen., Baltimore, Md., for defendants.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiffs Lillie Monroe-Lord and Lois M. Smith brought this action for employment discrimination against the University of Maryland, Eastern Shore ("UMES"); the University of Maryland, Adelphi; William P. Hytche, Chancellor of UMES; Edward V. Ellis, Vice Chancellor for Academic Affairs at UMES; and John S. Toll, President

of the University of Maryland. Both plaintiffs allege discriminatory denial of tenure and unequal pay on the basis of race and sex, and plaintiff Monroe-Lord contends she was discriminated against because of pregnancy. Plaintiffs bring their complaint pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This matter was presented to the Court for trial without a jury. Having heard the evidence and the arguments of counsel, the Court makes the findings of fact and conclusions of law stated herein.

## I. BACKGROUND FACTS

*Dr. Lillie Monroe-Lord.* Dr. Monroe-Lord was hired by UMES as an assistant professor and Head of the Department of Home Economics in September 1977. Her contract was for an initial term of three years and could be renewed for an additional three years. Plaintiffs' Exhibit 1. Plaintiff's appointment was a tenure-track position. At the time Monroe-Lord was hired, the University had no formal promotion and tenure decision-making process.

When Dr. Toll assumed the presidency of the University in 1978, he informed the UMES campus that standards for promotion and tenure would become more rigorous in order to reach parity with the rest of the University of Maryland system. Dr. Jodellano Statom, Vice Chancellor for Academic Affairs at UMES from 1979–82, testified that 1979 marked the beginning of a transition period for the promotion and tenure process at UMES. By 1980, criteria and procedures for promotion and tenure were set forth in a document entitled "Interim Policies and Procedures Relating to Appointments, Promotions, and Tenure." Defendants' Exhibit 1.[1]

Pursuant to the Interim Policies, assistant professors underwent mandatory review for promotion to associate professor with tenure in their fifth year. To receive tenure, the faculty member had to demonstrate excellence in teaching, in research or creative work, and in professional and community services, and it was important to have an earned doctorate or recognized terminal degree. Several witnesses testified that after 1980, no faculty member who lacked a terminal degree received tenure.

The Interim Policies also set forth the procedures for promotion and tenure decisions. The candidate was first reviewed by his or her department. Then the faculty member was evaluated by a campus-wide Promotion and Tenure Committee made up of faculty. The Campus Committee submitted its recommendation to the Vice Chancellor for Academic Affairs, who independently reviewed the candidate's record and presented a recommendation to the Chancellor. The Chancellor then evaluated the candidate, and forwarded his recommendation to the President. Each level of review was independent. Authority for appointment to the ranks of lecturer, instructor, and assistant professor was vested in the Chancellor. Appointments to the level of associate professor and professor, and decisions concerning tenure, required the Chancellor's approval, but were made by the President of the University. If a candidate was denied tenure, then his or her sixth year at UMES usually would be the final year in a tenure-track position. Dr. Statom assisted the faculty by explaining the new procedures and conducting sessions on how to prepare for promotion and tenure review.

At her request, Monroe-Lord was considered for promotion to associate professor with tenure in 1980–81, a year before her mandatory review. Each level of review recommended against promotion and tenure, and plaintiff was turned down. Defendants' Exhibits 8, 9, 10, 11. In her mandatory review year, the campus Committee for Promotion and Tenure, the Vice Chancellor for Academic Affairs, and the Chancellor recommended against promotion and tenure. Defendants' Exhibits 15, 16. Monroe-Lord was informed by let-

---

**1.** The Interim Policies applied to tenure decisions for the 1980–81 and 1981–82 academic years. The "UMES Appointment, Tenure and Promotion Document," approved March 8, 1983, was applicable to decisions made during the 1982–83 academic year and thereafter. Defendants' Exhibit 2.

ter dated June 14, 1982, that promotion and tenure had been denied, and that her contract would terminate at the end of the 1982–83 academic year. Defendants' Exhibit 17.

Defendant Edward Ellis replaced Dr. Statom as Vice Chancellor for Academic Affairs in January 1983. Plaintiff requested reconsideration of her promotion and tenure decision, which Ellis denied. She subsequently submitted her materials to Ellis, so he requested that the 1982–83 Campus Committee informally review Monroe-Lord's application. The Committee voted against tenure, and the Vice Chancellor concurred. Defendants' Exhibits 20, 21. Monroe-Lord subsequently requested an extension of her probationary period as an assistant professor, which was denied. Defendants' Exhibit 22.

Dr. Retia Walker, a black woman, was hired to replace plaintiff as Chair of the Department of Human Ecology[2] in 1983–84. UMES was unable to fill Monroe-Lord's teaching position by August 1983, and she was rehired as a lecturer for the 1983–84 academic year. The contract stipulated that her appointment would terminate on June 8, 1984. Defendants' Exhibit 25. By August 1984, UMES had not filled Monroe-Lord's tenure-track post. UMES officials had previously offered to negotiate rehiring Monroe-Lord on a temporary basis, but she desired the tenure-track slot, not an appointment as Lecturer. Defendants' Exhibit 32. Given plaintiff's prior negative tenure decisions, UMES declined to hire her into another tenure-track position.

Dr. Monroe-Lord is a black woman. Ms. Missale Kumelachew, also a black woman, was hired as lecturer in the Department of Human Ecology for 1984–85. Ms. Laurie Van Heukelem was hired on a part-time basis to teach a course Ms. Kumelachew was not qualified to teach. Plaintiffs' Exhibit 82. The tenure-track slot was eventually filled by Dr. Maggie Clausell, also a black woman.

Plaintiff Monroe-Lord testified that throughout her employment with UMES, Chancellor Hytche sexually harassed her. She alleged the following incidents as examples of his conduct. In 1978, plaintiff asked Hytche for a salary increase, and she did not receive it. Hytche purportedly informed plaintiff that she was bright and attractive, and that she could rise to the top, but for her naivete. Hytche allegedly called her at home on numerous occasions, inquiring whether her husband were in and asking plaintiff to invite him over. Hytche scheduled meetings with Monroe-Lord in his office between 4:30 and 4:45 p.m. when the staff had already left the building. The meetings purportedly had no concrete agenda, and Hytche allegedly made such comments as, "you're attractive", "you wear your weight well", and "if you do things for me, I'll do things for you". Hytche purportedly informed plaintiff that he was in total control of the campus, and that if she wanted to advance, she knew what he desired. Hytche allegedly brushed up against Monroe-Lord, made innuendos regarding her sexual life with her husband, and told plaintiff he wanted to sleep with her. Plaintiff testified that in May 1984, Chancellor Hytche asked if she were pregnant, and she replied that she was. Hytche allegedly told plaintiff that she had done nothing for him, and "now it was too late."

■ The Court finds plaintiff's testimony unworthy of credence. Although the pattern of sexual harassment allegedly occurred throughout Monroe-Lord's seven-year term of employment, plaintiff never told anyone about these events, nor did she file a grievance. Dr. Thomas Hopkins, full professor at UMES, had a romantic relationship with plaintiff during 1977–78. He testified that she never told him Hytche had sexually harassed her. Dr. Woodrow Knight, Special Assistant to the Chancellor for Agricultural Affairs and Monroe-Lord's immediate superior during 1980–82, testified that plaintiff never complained to him of sexual harassment. Dr. Retia Walker

2. Upon Dr. Monroe-Lord's suggestion, the department name had been changed from Home Economics to Human Ecology.

testified that plaintiff never made any complaint to her regarding sexual harassment. Plaintiff admitted she made no complaints to Dr. Jodellano Statom, Vice Chancellor for Academic Affairs, and plaintiff made no complaints to President Toll.

Although UMES had no written policy regarding sexual harassment complaints during plaintiff's employment, a faculty member could report a grievance to the department head or the director of human relations. Grievances less serious than sexual harassment had been directed to the President and Board of Regents. This Court finds it difficult to believe that Dr. Monroe-Lord would suffer repeated incidents of sexual harassment over a seven-year period and neither tell anyone about them nor report them to university officials. The Court also finds it difficult to believe that plaintiff would continue to meet with Hytche alone if he were harassing her. She could have arranged for someone to accompany her to the meetings Hytche called, if he truly harassed her.

In order to buttress her assertion that Hytche could do what he wished because he was in total control of the campus, plaintiff testified that Vice Chancellor Statom informed plaintiff that Statom did whatever Hytche told her. Plaintiff also stated that the Promotion and Tenure Committees followed Hytche's order. According to the credible evidence, plaintiff is mistaken. Chancellor Hytche, Vice Chancellor Statom, Vice Chancellor Ellis, and two promotion and Tenure Committee chairpersons testified that each level of tenure review is independent, and they were never swayed by Chancellor Hytche's opinion in making their recommendations. In addition, Dr. Statom impressed the Court as an articulate, forthright and independent individual. She emphatically stated she did not simply follow Hytche's commands, and the Court finds her testimony highly credible.

In addition, documentary evidence indicates that plaintiff prevaricated about one incident of Hytche's harassing her, which casts doubt on all of plaintiff's allegations. In 1982, plaintiff attended a meeting of the National Association of State Universities and Land-Grant Colleges in St. Louis, Missouri. She testified that Hytche sat next to her on the plane to St. Louis and made sexual innuendos about how plaintiff would look in particular clothing. Hytche allegedly pointed to magazine pictures of women in low-cut dresses and transparent night-wear, asking plaintiff "How do you like that?" and "Do you wear that?"

Hytche testified he made no such comments, and he has no recollection of travelling to the conference on Monroe-Lord's flight. According to expense statements filed with UMES, Hytche left Princess Anne at 6:40 a.m. on November 7th and arrived in St. Louis at 12:15 p.m. Monroe-Lord left Princess Anne at 5:30 a.m. and arrived in St. Louis at 9:45 a.m. On the return trip, Hytche left St. Louis at 8:00 a.m. on November 10th, arriving in Princess Anne at 3:05 p.m., and Monroe-Lord left St. Louis at 8:30 a.m., arriving at Princess Anne at 1:47 p.m. Defendants' Exhibits 71–A through C. Monroe-Lord testified that she took the first flight out of Salisbury, Maryland, spent time connecting to another flight in D.C., and she and Hytche travelled on the connecting flight. This does not seem possible, given that Monroe-Lord arrived in St. Louis at 9:45 a.m. and Hytche arrived at 12:15 p.m. Apparently, Monroe-Lord and Hytche did not fly to or from the conference together, thus Monroe-Lord's statements that Hytche made offensive comments to her on the plane trip to the conference are not worthy of belief.

The manner in which Monroe-Lord handled her allegations of sexual harassment also indicates they have no basis in fact. Plaintiff filed an administrative charge of employment discrimination with the Maryland Commission on Human Relations on November 29, 1984. Plaintiffs' Exhibit 79. Sexual harassment is neither mentioned nor alluded to in the administrative charge. Defendant Hytche denied that he ever sexually harassed Monroe-Lord. He first learned of such allegations when he received a copy of plaintiff's deposition taken in June 1986. Hytche had earlier participated in an EEOC fact-finding hearing, where neither Monroe-Lord nor her counsel mentioned sexual harassment.

The administrative charge admitted as Plaintiffs' Exhibit 79 includes a five-page typed attachment.[3] Monroe-Lord testified that she hand-wrote a narrative detailing the acts she believed to be discriminatory. She submitted the handwritten notes to the Maryland Commission on Human Relations, which typed the charge for her, including the five-page attachment. The only reference to harassment is found on pages one and four of the attachment:

The following action was taken against me that I believe to be discriminatory. Issues:

1) Refusal to renew contract due to pregnancy.

2) Denied tenure and promotion when male colleagues who are less qualified were tenured and promoted without publications.

. . . . .

4) Salary inequity.

5) Harassment and stress.

\* \* \* \* \* \*

Issue 5: Harassment and stress

The stress encountered during my pregnancy as a result of not receiving the contract at the last minute (two days prior to the start of the semester).

Plaintiffs' Exhibit 79. Monroe-Lord testified that she included sexual harassment in her handwritten notes, but the Commission representative deleted all references to sexual harassment when he or she typed it. To the surprise of all, especially defendants, plaintiff subsequently introduced into evidence the handwritten notes she claims she submitted to the Commission, which included a section on sexual harassment. Plaintiffs' Exhibit 126.[4]

The Court discounts this evidence and plaintiff's testimony for the following reasons. First, it is highly unlikely that the Maryland Commission on Human Relations would unilaterally decide to edit out of an individual's charge of employment discrimi-

nation all factual references to sexual harassment. Mr. Oliver Corbin, the Commission representative who interviewed Monroe-Lord when she initiated her complaint, testified that when the Commission types an individual's charge, it does not necessarily include every item of information submitted by the individual. However, he continued, the Commission does include all relevant material, and a claim of sexual harassment is certainly relevant. Mr. Corbin remembered discussing plaintiff's case with her. He recalls her complaint that she had been denied opportunities because she is female, but he does not remember any complaint of sexual harassment.

Furthermore, plaintiff *signed* the administrative charge of discrimination. If the Commission had failed to include an important aspect of her allegations, surely plaintiff would have sent the charge back for correction rather than signing the document. In addition, the civil complaint that initiated this lawsuit makes no mention of sexual harassment.

The Court reluctantly concludes that the handwritten notes submitted as Plaintiffs' Exhibit 126 have been altered. While these notes generally appear to have been transcribed verbatim in the five-page attachment to the administrative charge (Plaintiffs' Exhibit 79), a few noteworthy differences exist. On page one of the handwritten notes at "Issue 5", the original words were erased and the following words written: "Sexual Harassment and Job Stress." The typewritten version, which is on page one of the five-page attachment, reads "Harassment and stress." On page seven of the handwritten notes, a more detailed description of harassment and stress appears. Again, the original words after "Issue 5" have been erased, and "Sexual Harassment and Stress" written in, whereas only "Harassment and stress" appear in the typed document.

---

3. Neither the copy of the charge submitted with plaintiffs' civil complaint nor the copy submitted in plaintiffs' opposition to defendants' motion for summary judgment contained this attachment.

4. The exhibit was admitted over defendants' objection that plaintiffs had abused the discovery process by not producing these notes before trial.

The description of stress reprinted above at page 11 appears verbatim in the handwritten notes. Following this, a separate sheet of paper detailing sexual harassment has been taped to the handwritten notes. This language appears nowhere in the typed attachment to plaintiff's administrative charge. While the Court recognizes that plaintiff edited the handwritten notes by cutting and pasting pieces of paper together, the tape securing the section on sexual harassment is markedly different from the tape used throughout the rest of the exhibit, indicating that this section of paper was appended at a different time. The Court concludes that the notes originally submitted to the Commission included no charge of sexual harassment.

Monroe-Lord's failure to raise the allegation of sexual harassment in either her administrative charge or civil complaint, each filed after she left UMES, negates her self-serving testimony that she did not complain of the harassment because she feared reprisal. For all the foregoing reasons, the Court does not believe that defendant Hytche sexually harassed Monroe-Lord.

Plaintiff also contends she was not allowed time to pursue research. The evidence revealed, however, that there were too many demands upon her time to effectively pursue research and chair her department. Moreover, Chancellor Hytche secured funds for plaintiff to conduct research in 1981–82.

Plaintiff requested twenty-five percent release time for the 1981 spring semester in order to establish Women in International Development ("WID") activities on campus. She also requested approval and financial support to participate in WID research projects in the Caribbean from February 12–27, 1981. Plaintiffs' Exhibits 12, 13. Dr. Dennis Ignasias, Director of Research and Grants, supported plaintiff's request, as did Dr. Woodrow Knight, plaintiff's immediate superior. Vice Chancellor Statom supported plaintiff's request, provided Monroe-Lord develop a proposal in Home Economics Extension during the release time. Plaintiffs' Exhibits 15, 16, 17. The Chancellor initially granted plaintiff's request for release time, but denied her request for Caribbean travel during the spring semester. Because similar opportunities would be available on a continuing basis, the Chancellor decided Monroe-Lord should undertake such travel during the summer when it would not disrupt her teaching schedule. Dr. Knight concurred with this decision. Plaintiffs' Exhibits 18, 19.

Monroe-Lord subsequently submitted another request for leave during February 23–27, 1981. Plaintiffs' Exhibit 25. Plaintiff, Dr. Knight, Dr. Statom and Chancellor Hytche met to discuss her proposal. Notes from the meeting indicate that plaintiff also requested at least fifty percent leave time during 1981–82 to conduct research. The Chancellor responded that her responsibilities as Chairperson prohibited this, but he would explore the feasibility of a 100% research position for plaintiff. The Chancellor also indicated that plaintiff had too many obligations for him to approve release time in Spring 1981, but he would seriously consider allowing participation in a summer project. He noted that if Monroe-Lord could not satisfy her current obligations, it might be necessary to remove her from departmental administrative responsibilities. Plaintiffs' Exhibit 26. Several days later, the Chancellor reluctantly approved Monroe-Lord's request for administrative leave to travel to the Caribbean in February 1981. Plaintiffs' Exhibit 28.

In March 1981, Chancellor Hytche informed plaintiff that funds would be available for her to conduct research on a full or part-time basis beginning the following June. Because the demands on the Head of the Department of Human Ecology were so great, and because Hytche wanted the Chair to teach, he planned to hire a new chairperson if plaintiff wished to pursue research. Plaintiffs' Exhibit 29.

*Ms. Lois M. Smith.* UMES hired plaintiff Smith in 1966 as an instructor in the Physical Education Department. Plaintiffs' Exhibit 87. She received an annual contract each succeeding year. In 1975, Dr. Leon Coursey, then Department Chairman, attempted to secure promotion and

tenure for Smith. The University did not act upon the request, and Coursey resubmitted it to the Vice Chancellor for Academic Affairs in October 1976. Plaintiffs' Exhibit 88.

Smith was promoted to assistant professor in 1977. At the time, promotion to assistant professor often included tenure. But when Smith received her formal acknowledgment of promotion, she learned she had not received tenure. Coursey inquired into the matter, and Vice Chancellor Pender told him it was an oversight. He advised Smith to reapply and tenure would be granted. In November 1977, Dr. Coursey submitted another letter requesting tenure for Smith. Plaintiffs' Exhibit 89. Smith heard nothing by the end of that academic year, and the Vice Chancellor again told her it was an oversight.

Pender left the University in 1978 and turned his files over to Wade Ellis. Pender advised Smith to follow up on her request for tenure. Wade Ellis departed at the end of the 1978–79 academic year. Smith reapplied for tenure in December 1979 by a letter to the new Vice Chancellor for Academic Affairs, Dr. Jodellano Statom. Plaintiffs' Exhibit 91. At the time, Smith was acting department head. Dr. Statom informed plaintiff that her "tenure clock" had begun to run upon promotion to assistant professor in 1977, and that her request for tenure would not be considered until Smith had an opportunity to develop a list of publications, begin to acquire a national reputation in her field, and demonstrate university-wide service. Statom told Smith to formally apply for tenure in her fifth year as an assistant professor. Plaintiffs' Exhibit 94.

Consequently, Smith applied for tenure in 1982. Her department head strongly recommended her. Plaintiffs' Exhibit 96. The campus Promotion and Tenure Committee noted, "While granting tenure at the rank of Assistant Professor without promotion is not generally considered for approval, the committee voted unanimously to recommend tenure only for the applicant." The Committee noted that plaintiff lacked research and publications, but remarked upon her high ratings in teaching and sixteen years of service to UMES. Defendants' Exhibit 61. Dr. Statom declined to recommend tenure due to plaintiff's lack of scholarly productivity and terminal degree. Defendants' Exhibit 62. Chancellor Hytche recommended that Smith be granted tenure despite the fact that she did not meet the new standards implemented in 1980, Defendants' Exhibit 63, but President Toll did not approve the recommendation due to plaintiff's inadequate scholarly activity and lack of a Ph.D. Defendants' Exhibit 64. Hytche informed Smith on June 30, 1982 that tenure had been denied, and her contract would terminate at the end of the 1982–83 academic year. Plaintiffs' Exhibit 101. Plaintiff was devastated. She turned to Hytche, who informed her that she would have a job at UMES as long as he did. When her contract as assistant professor terminated, plaintiff was rehired as a lecturer, and she continues to teach at UMES.

Smith believed President Toll had no animosity toward her. She felt he discriminated against her by virtue of the fact that he was responsible for everything his subordinates did. Plaintiff believed she was discriminated against by Hytche, who could have asked Dr. Statom to rescind her negative recommendation. Smith contended Hytche made such a request for a male faculty member. But for that fact, plaintiff testified, she would not feel discriminated against because of sex in her denial of tenure.

Smith met with a representative from the Maryland Commission on Human Relations in October 1984, but she never filed an administrative charge.

## II. TITLE VII CLAIMS

Title VII of the Civil Rights Act of 1964 provides that it shall be unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment,

because of such individual's race ... [or] sex ...; or

(2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee, because of such individual's race ... [or] sex....

42 U.S.C. § 2000e–2(a).

### A. *Denial of Tenure and Promotion*

Plaintiffs claim they were denied tenure and promotion because of their sex and race. Monroe-Lord filed a charge of discrimination with the Maryland Commission on Human Relations on November 29, 1984, which was referred to the EEOC on January 3, 1985. Plaintiffs' Exhibit 79. Smith never filed an administrative charge. As determined in the Memorandum Opinion resolving defendants' motion for summary judgment, Smith was permitted to litigate the 1982 tenure denial under Title VII despite failing to exhaust administrative remedies. *See* April 1987 Memorandum at 14–18. As discussed below, however, both plaintiffs' claims for tenure denial are time barred.

■ Generally, a Title VII litigant who initially files her charge in a state agency may sue upon the allegedly discriminatory acts occurring within the 300 days prior to filing with the EEOC—in this case, the 300 days prior to January 3, 1985. 42 U.S.C. § 2000e–5(e). Plaintiffs were notified in June 1982 that they had been denied tenure. These allegedly discriminatory acts clearly fall outside the 300–day limitations period. *See Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (the discriminatory act occurred when the tenure decision was made and communicated to plaintiff, even though the eventual loss of the teaching position did not take place until one year later); April 1987 Memorandum at 10–12.

This Court previously ruled, however, that if plaintiffs prove a pattern and practice of discrimination against black and/or female faculty, and that each plaintiff suffered a discriminatory act within the requisite 300 days, then they may prove a continuing violation of Title VII, and the 1982 tenure denial would not be time barred. *See* April 1987 Memorandum at 12–14. Proof of isolated discriminatory acts is insufficient to establish a pattern or practice of discrimination. Rather, plaintiffs must prove by a preponderance of the evidence that sexual and/or racial discrimination was defendants' standard operating procedure. *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875–76, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984), *quoting Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977).

■ Plaintiffs produced little evidence of discrimination on the basis of race. UMES is an historically black institution. Currently, approximately 70% of the students and 50% of the faculty are black. Virtually all the decision makers in plaintiffs' promotion and tenure process were black. Dr. Gerald Johnson and Dr. Mary Fair Burks, chairpersons of the 1982 and 1983 Promotion and Tenure Committees, are black. Though the evidence did not disclose the other faculty members who comprised those committees, each committee reflected a cross-section based on race and sex. Dr. Statom and Dr. Ellis, Vice Chancellors in 1982 and 1983, and Chancellor Hytche are also black.

Plaintiffs produced no evidence that white faculty members received promotion and tenure at a significantly higher rate than blacks. It appears that plaintiffs' claim of racial discrimination is based solely upon the fact that a white, female assistant professor denied tenure in 1982 was eventually granted tenure in 1985. To protect the privacy of non-party faculty members when discussing confidential tenure evaluations, the Court will refer to them by code. The woman described above is Faculty Member 1. She underwent mandatory review in 1982, the same year as plaintiffs, and the Promotion and Tenure Committee gave her a positive recommendation. Vice Chancellor Statom believed her teaching and service were outstanding, but she had limited publications. Because Faculty

Member 1 exhibited promise for expanding her publications, and because of her demonstrated commitment to UMES, the Vice Chancellor recommended denying tenure in the fifth year, but granting an extension and another review in a later year. Defendants' Exhibit 34. Chancellor Hytche recommended that she be granted tenure in 1982, but President Toll denied it.

Faculty Member 1 proceeded to publish several more articles. In January 1985, Chancellor Hytche again recommended promotion and tenure for her. With his letter to President Toll, the Chancellor submitted a strong recommendation from the campus, signed vita, and copies of at least ten articles published by Faculty Member 1 in the preceding eighteen months. He later supplemented that material with letters from professionals outside UMES who reviewed her work. Defendants' Exhibit 35. As the Promotion and Tenure Committee had voted for tenure in 1982, the President approved Hytche's recommendation. However, he requested the Committee verify that it still approved promotion and tenure. On April 19, 1985, Dr. Hytche notified Faculty Member 1 that she had been granted promotion and tenure. Ten days later, the Promotion and Tenure Committee was convened to evaluate her for promotion. While the Court finds it a bit odd that Faculty Member 1 was notified of a favorable decision before the Committee met to re-review her work, it is not so odd as to justify an inference of racial preference. Both the Chancellor and the Promotion and Tenure Committee gave Faculty Member 1 a favorable recommendation in 1982, which the President turned down. The *President* had to be satisfied with her research in

1985 to approve her for promotion and tenure.

The Court concludes that plaintiffs have not proven a pattern and practice of racial discrimination against UMES faculty members.

■ As to a pattern of sex discrimination, plaintiffs presented evidence that few women have been granted tenure or promotion to higher ranks, and that there were episodes of seeming irregularities in the tenure process. The evidence was far too spotty to prove that sex discrimination was defendants' standard operating procedure. *Cooper, supra,* 467 U.S. at 875–76, 104 S.Ct. at 2799. This conclusion is elaborated upon below.

Plaintiffs testified that between 1977 and 1985, no women were granted tenure. Plaintiffs failed to present evidence, however, of the number of women who *applied* for tenure between 1977 and 1985. Nor did they produce evidence of the women's qualifications for tenure. While statistics alone can give rise to a prima facie case of a pattern or practice of discrimination, *Hazelwood School District v. United States,* 433 U.S. 299, 305, 97 S.Ct. 2736, 2740, 53 L.Ed.2d 768 (1977), without knowing how many women applied for promotion or tenure, it is impossible for this Court to hold that the fact that no women were granted tenure in a given period establishes, or even gives rise to an inference of, a pattern of sex discrimination.

Few women occupy the higher academic ranks at UMES. Plaintiff Smith testified to the following breakdown of faculty in a recent, unspecified year:

| Total | Full Prof. | Assoc. Prof. | Asstnt. Prof. | Instructors | Lecturers |
|---|---|---|---|---|---|
| 76 Male | 9 | 13 | 31 | 6 | 17 |
| 25 Female | 1 | 2 | 7 | 2 | 13 |

The ranks assistant professor and above are tenure track. Clearly the higher ranks are dominated by men. These bald statistics alone, however, do not give rise to an inference of a practice of discrimination against women. Without knowing how many qualified women applied for each position, the Court does not know whether the number of women in each rank represents the percentage of female applicants for promotion, or whether the numbers suggest that women are being promoted at

a significantly lower rate than men. Moreover, the number of faculty in each rank depends on a variety of factors: length of service, credentials, and scholarly and professional achievements, among others. Plaintiffs presented no analysis of the above data, and the Court lacks sufficient information to determine whether this numerical breakdown is a result of general market forces or other sex-neutral factors, or whether it indicates intentional discrimination against women at UMES. *See Wilkins v. Univ. of Houston*, 654 F.2d 388, 400–401 (5th Cir.1981), *vacated on other grounds*, 459 U.S. 809, 103 S.Ct. 34, 74 L.Ed.2d 47 (1982), *aff'd in pertinent part after remand*, 695 F.2d 134 (5th Cir.1983); *Mich. State Univ. Faculty Assoc. v. Mich. State Univ.*, 93 F.R.D. 54, 60 (W.D.Mich. 1981) ("Such gross statistics, which fail to consider critical factors such as departmental requirements and the relevant labor market, provide no basis for a finding of gender discrimination where there are legitimate special qualifications for advancement and no evidence is introduced as to the number and availability of qualified women.")

Plaintiffs did produce evidence that four women applied for tenure and/or promotion in 1982, and all four women were denied. While these numbers might give rise to an inference of discrimination, defendants rebutted any such inference. The four women were Monroe-Lord, Smith, Faculty Member 1, and Faculty Member 2. Defendant Hytche *recommended* Smith for tenure, but President Toll denied it because Smith lacked the required terminal degree and scholarly productivity. Defendant Hytche *recommended* Faculty Member 1 for promotion and tenure, but President Toll denied it. She was granted an extension and subsequently *received* promotion and tenure after producing substantial publications.

Monroe-Lord received a negative recommendation from every level of review, including that of her faculty peers. The Committee on Promotion and Tenure and the Vice Chancellor noted the insufficient level and quality of plaintiff's research and her inadequate community and university service. Defendants' Exhibits 15, 16. Faculty Member 2 was denied tenure due to her insufficient scholarly productivity and service. Vice Chancellor Ellis resubmitted her application in 1983, but the Committee again voted against promotion and tenure because her contributions to the community were below average, and she had completed no additional research since her fifth-year review. Defendants' Exhibits 36, 37, 38. Plaintiffs presented no evidence that male faculty members who received promotion or tenure in 1982 were evaluated under different standards or procedures.

Plaintiffs attempted to substantiate their claim of a practice of sexual discrimination with evidence of seeming procedural irregularities in the tenure process.[5] Tenure is granted to faculty members, not administrators. Vice Chancellor Edward Ellis received tenure in 1983 despite the fact that he occupies an administrative position. Ellis, however, had been tenured in his previous position at another university. Thus it was not unusual for UMES to grant him tenure upon hire.

Plaintiffs produced evidence of one unusual incident. Dr. Mortimer Neufville was hired in 1983 as Assistant Vice Chancellor for Agricultural Affairs and associate professor with tenure. The evaluation committee supported his hire. Plaintiffs' Exhibit 109. Two years later, he was demoted to assistant professor with tenure. President Toll noted this was an unusual tenured appointment, but he believed it recognized the important services and the leadership role Dr. Neufville had performed. Plaintiffs' Exhibit 110. While this was unique in light of the normal system of promotion from assistant professor to associate professor to full professor, it is more indicative of an unusual effort to retain a valued faculty member than a system of sexual discrimination.

<hr>

5. The Court notes that the tenure process changed dramatically at UMES in 1980. Thus, it is not accurate to compare persons who received tenure prior to 1980 to those who were evaluated under the new system.

The Court concludes that plaintiffs did not prove a pattern or practice of discrimination at UMES. Accordingly, they have not established a continuing violation of Title VII, and their claims for tenure denial are barred by the statute of limitations.

Even if their claims were not time barred, plaintiffs failed to establish that defendants intentionally discriminated against them on the basis of race or sex. The well-known allocation of burdens in a Title VII suit was set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination. If plaintiff succeeds, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for the employee's discharge. Should defendant carry this burden, plaintiff then has the opportunity to show by a preponderance of the evidence that defendant's stated reasons were in fact a pretext for discrimination. *McDonnell Douglas, supra*, 411 U.S. at 802–804, 93 S.Ct. at 1824–25. The ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains at all times with the plaintiff. *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093.

The *McDonnell Douglas* Court stated that a prima facie case of discrimination may be established by showing:

(i) that [plaintiff] belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. The proof required to establish a prima facie case will necessarily vary in different factual situations. To establish a prima facie case of discriminatory denial of tenure, each plaintiff must prove the following elements:

1. she is a member of a protected group

2. she was qualified for tenure

3. she was not granted tenure

4. the University granted tenure to other persons possessing similar qualifications at approximately the same time. *Smith v. Univ. of North Carolina*, 632 F.2d 316, 340 (4th Cir.1980). *See also Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir. 1984); *Lieberman v. Gant*, 474 F.Supp. 848, 863–64 (D.Conn.1979), *aff'd*, 630 F.2d 60 (2d Cir.1980). "Given the elusive nature of tenure decisions, ... a prima facie case that a member of a protected class is qualified for tenure is made out by a showing that some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question." *Zahorik, supra*, 729 F.2d at 93–94.

■ A sincere belief that a person is not qualified for a job is an adequate justification for an employment decision and rebuts a complainant's prima facie case. *Lieberman, supra*, 474 F.Supp. at 865.

For each plaintiff to succeed in carrying her ultimate burden of persuasion:

the evidence as a whole must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's work, the candidate's teaching abilities or the academic needs of the department or university. Absent evidence sufficient to support a finding that such disagreements or doubts are influenced by forbidden considerations such as sex or race, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities.

*Zahorik, supra*, 729 F.2d at 94. The Court's job is not to evaluate a professor's academic performance and decide whether she should have been awarded tenure. Rather, the Court must determine whether

the decision to deny tenure was based on impermissible reasons. *Megill v. Brd. of Regents*, 541 F.2d 1073, 1077 (5th Cir.1976).

### i. *Monroe-Lord*

It is unclear whether Monroe-Lord established a prima facie case of discrimination. She is a member of a protected group, and she was denied tenure when male faculty with similar qualifications were granted tenure. The difficult question is whether she has established a prima facie case that she was qualified for tenure. *Zahorik, supra*, 729 F.2d at 93–94. Although every level of review recommended against her, the campus Promotion and Tenure Committee was not unanimous. Two of the five members voted for promotion and tenure. Defendants' Exhibit 15. In light of this, the Court feels reluctant to state categorically that plaintiff was not qualified for tenure. Accordingly, the Court will assume *arguendo* that she has established a prima facie case of discrimination.

■ Defendants successfully rebutted Monroe-Lord's prima facie case with legitimate, non-discriminatory reasons for her denial of promotion and tenure. The Promotion and Tenure Committee noted that plaintiff's research was limited to approximately five articles, some co-authored, published in lesser journals. Monroe-Lord had published nothing in national nutrition journals. The Committee concluded that the level and quality of her research was insufficient, and her community/university service should be stronger. Defendants' Exhibit 15.

The Vice Chancellor concurred in this evaluation. She noted that Dr. Monroe-Lord was not rated as outstanding in either teaching, research, service or administration. Some of the materials plaintiff submitted as indicative of her leadership qualities were simply agenda items for a departmental faculty meeting. In addition:

> A three volume bound monograph comprised of units submitted by students enrolled in the Nutrition Education courses was submitted and identified as a publication; although there is serious concern both as to whether this non-footnoted resource guide that carries Dr.

Lord's name on the cover is indeed a publication and whether its authorship should legitimately be claimed by her. Other publications are co-authored and in journals that do not have national circulation....

> While Dr. Lord is willing to and does involve herself in numerous service activities, she rarely provides leadership to the group. She tends to move into groups that may afford her greater opportunity for personal travel and expansion rather than where she can best serve the institution; for example, she has missed the last three meetings of the Honors committee including the meeting in Baltimore, but she has aligned herself with the international programs for women in agriculture and taken trips that accrued from that association.

> Minimal publications, community and university service, and marginal teacher/administrative effectiveness support my decision to concur with the campus committee.

Defendants' Exhibit 16. Vice Chancellor Statom testified that students had complained that plaintiff missed classes or was late, and Monroe-Lord missed or was late to several sessions of a continuing education course she taught. Defendants' Exhibit 7. In addition, the Maryland Department of Education threatened to withdraw a grant awarded to plaintiff because she had not followed requisite procedures.

Plaintiff Monroe-Lord contends that defendants' rationale is a pretext for discrimination because she was more qualified than several male professors who received promotion and/or tenure between 1981 and 1984. In each instance, plaintiff believes she was better qualified because she had published more articles.

Faculty Member 10, chairman of his department, was promoted to Associate Professor with tenure in 1981. Plaintiff testified that he had no publications in 1981. Vice Chancellor Statom testified that in her opinion, Faculty Member 10 was more qualified than plaintiff. Although his publications were limited, his discipline was such

that scholarly productivity did not depend solely on publications. In addition, his administrative capacity, teaching ability, and service were outstanding. He effectively revamped his entire department. She noted that both the departmental and campus committees indicated that he was highly regarded as an administrator and teacher. Defendants' Exhibit 53.

Faculty Member 6, chairman of his department, was tenured as an Assistant Professor in 1981. Monroe-Lord contends he had limited research. He was recommended for promotion and tenure by the departmental committee, the campus committee, and Vice Chancellor Statom. He had published ten articles in a referreed journal, albeit in the five years before arriving at UMES. He was acknowledged as an exceptionally good chairman, as having given outstanding service to the university, and as being a good teacher. Defendants' Exhibits 44, 45.

Faculty Member 5, chairman of his department, was granted tenure in his rank as Associate Professor in 1982. Monroe-Lord contends he had only one publication. The departmental committee recommended tenure, the campus committee voted against it, and Vice Chancellor Statom voted to delay the decision. Faculty Member 5 had been hired as an Associate Professor in 1981. He previously taught as an Associate Professor at another university. He spent his first year at UMES developing his department's program, and his efforts and qualifications were evaluated as exemplary and excellent. He published two co-authored articles prior to arriving at UMES, and he had presented papers at professional meetings. Moreover, Faculty Member 5 was one of the few blacks in this country who hold a Ph.D. in his specialty. As such, UMES viewed him as an exceptional role model. Defendants' Exhibits 42, 43.

Faculty Member 7 was granted tenure as Assistant Professor in 1982. Monroe-Lord contends he had no publications. His teaching was rated as very good to excellent; he had published one article in a major national journal, even though his dis-

cipline was not considered research-oriented; and he made outstanding contributions to the university. Defendants' Exhibits 46, 47.

Faculty Member 14 was awarded tenure as Assistant Professor in 1984. He was evaluated as exhibiting great strength in teaching, advising and service. The Promotion and Tenure Committee noted that his teaching load created less than favorable circumstances under which to conduct research, and they anticipated that he would produce more research as conditions improved. Given his outstanding evaluation in two of the required areas, the Committee and Vice Chancellor recommended tenure in his position as Assistant Professor.

Monroe-Lord also believed she was more qualified than Faculty Member 3, who was given tenure as an Assistant Professor in 1984. The Promotion and Tenure Committee unanimously recommended tenure. His teaching, recruitment, advisement and other services were rated outstanding, whereas his research was deemed adequate. Accordingly, he was tenured without promotion.

Plaintiff believes she was better qualified than each of these men, thus defendants discriminated against her by denying her promotion and tenure. Plaintiff introduced into evidence copious materials to substantiate her contentions that she was qualified for promotion and tenure. This Court lacks the expertise to evaluate plaintiff's credentials and determine whether she should have been granted tenure and promotion. *Smith v. Univ. of North Carolina, supra,* 632 F.2d at 345; *Cussler v. Univ. of Maryland,* 430 F.Supp. 602, 606 (D.Md.1977). A professor's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations. This Court may not set aside the decision to deny plaintiff promotion and tenure unless she proves by a preponderance of the evidence that it was based on an impermissible factor such as sex or race.

In reviewing the reasons why the above described men were promoted or ten-

ured, the Court notes that each of them was rated as very good to outstanding in at least two of the required areas of teaching, scholarship and service. Plaintiff, by contrast, was not rated by her peers as outstanding in any of these areas. Her argument that she was more qualified for promotion and tenure because she believed she had more published articles is insufficient to support a finding of discrimination. The number of articles an individual publishes is not dispositive. Scholarship is also evaluated by the stature of the journal in which a piece is published, as well as other factors. In addition, scholarship is only one area in which applicants are evaluated for promotion and tenure. Plaintiff has not proven that she was more qualified than the male applicants in the areas of teaching and service. Indeed, the evidence proves to the contrary.

Plaintiff has neither persuaded the Court that a discriminatory reason more likely motivated defendants to deny her advancement, nor shown that the proffered explanation is unworthy of credence. *Texas Dep't of Community Affairs v. Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 503. Accordingly, plaintiff failed to carry her burden of proving that defendants intentionally discriminated against her in denying promotion and tenure.

### ii. *Smith*

■ Plaintiff Smith failed to establish a prima facie case of discrimination in her denial of tenure because she lacked an objective qualification: the required terminal degree. Assuming *arguendo* that she had proven a prima facie case, defendants' reasons for denying tenure were legitimate and nondiscriminatory. Plaintiff did not have a Ph.D., and her scholarly productivity was deficient.

■ Although plaintiff was not a victim of discrimination in her denial of tenure, she was a victim of circumstance. Before 1979–80, the standards for tenure were less rigorous. University officials inadvertently failed to award plaintiff tenure upon her promotion to Assistant Professor in 1977. She reapplied during two transition years:

1978, when Vice Chancellor Pender left UMES and Wade Ellis temporarily held the position; and in December 1979, after Dr. Statom had imported the more rigorous standards for promotion and tenure to UMES. Plaintiffs' witness Dr. Leon Coursey noted that Smith's insufficient scholarly productivity and lack of the terminal degree made her unqualified for tenure under the new standards. Plaintiffs' Exhibit 131. Both the campus Promotion and Tenure Committee and Chancellor Hytche indicated that plaintiff did not satisfy the requirements, but they recommended tenure because of her length of service at UMES. Under the new standards, however, length of service did not justify awarding tenure, Defendants' Exhibit 1 at 5, and President Toll denied it.

Smith contends she was discriminated against because several individuals were tenured as assistant professor before and after 1980. Plaintiff testified that prior to 1980, six men and four women received tenure as assistant professors. These figures do not indicate a pattern of discrimination. After 1980, several men received tenure as assistant professors. Each of them possessed the required terminal degree, however, which plaintiff Smith lacked.

Plaintiff conceded that President Toll bore no animosity toward her. She claimed Hytche discriminated against her because he refused to ask Dr. Statom to rescind her negative recommendation. The credible evidence disclosed that Hytche never asked Dr. Statom, or any other decision-maker in the promotion and tenure process, to alter their decisions. Moreover, Chancellor Hytche recommended that Smith be granted tenure. This action hardly constitutes discrimination against plaintiff. Hytche also promised Smith that as long as he works at UMES, she will have a job, and he has fulfilled that promise.

Smith also felt discriminated against because Hytche recommended that Faculty Member 1, a white female, resubmit her application for tenure, and he did not make the same recommendation to Smith. The evidence disclosed, however, that Faculty Member 1 possessed the required terminal

degree, was evaluated by her peers as outstanding in teaching and service, and although her research was limited, she displayed potential for more substantial publications. Smith, by contrast, did not possess the required terminal degree or scholarly productivity. It was not discriminatory for Hytche to recommend that Faculty Member 1 reapply, and not recommend the same course of action to Smith.

Accordingly, the Court concludes that plaintiff failed to carry her ultimate burden of proving that race or sex discrimination caused her denial of tenure.

To recapitulate, both plaintiffs' claims for denial of tenure are time-barred, and even if they were not, plaintiffs failed to prove that their denial of promotion and tenure was motivated by either racial or sexual discrimination.

### B. *Unequal Pay*

■ Plaintiffs contend they were paid substantially less than their male counterparts. The analysis of a claim of unequal pay for equal work under Title VII is essentially the same as that under the Equal Pay Act, 29 U.S.C. § 206(d). *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir. 1981). To establish a claim of unequal pay for equal work, a plaintiff must prove that the employer "pays different wages to employees of opposite sexes for equal work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). The jobs need not be identical. Instead, only substantial equality of skill, effort, responsibility and working conditions is required. *Odomes, supra,* 653 F.2d at 250.

■ In this case, comparisons should be made within each plaintiff's department or discipline, or among comparable departments, rather than among all assistant professors at UMES. *Soble v. Univ. of Maryland,* 778 F.2d 164, 167 (4th Cir.1985) (departments other than plaintiff's are highly specialized and require distinct skills foreclosing any comparison). As the Fifth Circuit noted:

It appears uncontroverted that the most important factor is the college [i.e. department] in which a professor teaches—all other factors being equal, professors in [disciplines] such as law and engineering are, because of market forces outside of the university, paid significantly more than professors in colleges such as humanities and social sciences. Accordingly, plaintiffs' statistical evidence showing that men and women of the same age, rank, or length of service are paid differently does not demonstrate discrimination because the college factor has not been considered.

*Wilkins v. Univ. of Houston, supra,* 654 F.2d at 402.

■ Once a plaintiff has established that she has been paid unequally for equal work, the burden shifts to the employer to show that the differential is justified under one of the Equal Pay Act's four exemptions, which are available as affirmative defenses against Title VII claims. *Odomes, supra,* 653 F.2d at 251; *EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 724 (4th Cir.1980). The four exemptions are: 1) a seniority system, 2) a merit system, 3) a system which measures earnings by quantity or quality of production, and 4) a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1).

### i. *Monroe-Lord*

■ Plaintiff Monroe-Lord experienced a cut in pay when she accepted her initial offer of employment with UMES. Her contract stipulated that her salary would increase to $20,000 per ten months "providing the appointee receives the doctorate on or before December 1, 1977." Plaintiffs' Exhibit 1. Monroe-Lord did not obtain her doctorate until August 1978. Plaintiffs' Exhibit 49. In May 1978, plaintiff requested a salary increase. William Pender, then Vice Chancellor for Academic Affairs, replied that budget constraints prohibited the increase. Plaintiffs' Exhibit 2. Monroe-Lord again requested a salary increase in November 1978, stating that she understood she would receive the increase when all requirements for the doctorate degree

were completed. Plaintiffs' Exhibit 3. In actuality, Monroe-Lord's contract stated her salary would increase *if* she obtained the doctorate by December 1, 1977. Plaintiff did not satisfy this condition, therefore she was not automatically entitled to the increase.

Monroe-Lord testified that for purposes of salary, she believed her position was comparable to the following department chairmen: Dr. Raymond Blakely, Department of Physical Therapy, and Mr. Richard Gormley, Department of Hotel and Restaurant Management. She also believed she was comparable to Dr. Jagmohan Joshi, an agriculture research associate, and Dr. Mortimer Neufville, also in the Department of Agriculture.

Plaintiff stated their salaries compared as follows:

| | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|
| Monroe-Lord | $23,000 | $26,641 | $26,641 | — |
| Blakely | 40,000 | 45,200 | 46,782 | $49,841 |
| Gormley | — | — | — | 50,000 |
| Neufville | — | — | 50,000 | 53,500 |
| Joshi | — | 31,200 | — | — |

According to UMES budgets, the documents from which plaintiff obtained the above information, plaintiffs' testimony seems inaccurate. In FY 1984, Dr. Blakely was paid $46,782 as an associate professor. Plaintiffs' Exhibit 84. According to the 1984 Budget, Thomas Calnan was head of the Hotel and Restaurant Department, and he earned $39,976. Dr. Neufville earned $50,000 in 1984. *Id.* Unfortunately, plaintiff did not explain how she derived the above figures, and defendants did not challenge her recitation of salaries as incorrect. For purposes of this discussion, the Court will assume that plaintiff's numbers are correct, although the Court has some doubt in light of the underlying budgets. This factual discrepancy, however, does not affect the ultimate analysis.

Assuming plaintiff's numbers are correct, she compares her salary to individuals whose departments and responsibilities are not similar to her own. Plaintiff contends that Physical Therapy is similar to Human Ecology because it is an allied health program. She asserts that Hotel and Restaurant Management is analogous to her specialty, Foods and Nutrition. And plaintiff contends that the Department of Agriculture is similar to Human Ecology.

In actuality the disciplines are quite different, and the salaries vary accordingly because some fields are more marketable than others. Hotel and Restaurant Management is not similar to Human Ecol-ogy because UMES must compete with the private sector to lure individuals to teach. Mr. Gormley is the highest paid non-Ph.D. on the campus. Physical therapy is also a high paying field. Human Ecology, by contrast, is one of the lowest paid fields across the nation. *See* Defendants' Exhibit 59.

■ Although agriculture may be a comparable department, the individuals plaintiff compares herself to have very different responsibilities. Dr. Joshi is in agricultural research. He has spent time overseas, where he was paid on a per diem basis. Dr. Neufville was Assistant Vice Chancellor in charge of all agriculture research on campus, and thus had extensive administrative responsibilities.

Plaintiff's salary cannot be compared directly to these faculty for several additional reasons. First, she was paid for 9½ or 10 months' work, whereas Gormley, Blakely, Neufville and Joshi were on a 12-month contract. Second, from September 1977 until sometime during the 1983–84 academic year, plaintiff lived rent-free in campus housing. None of the other faculty benefitted from such a perquisite. Third, Dr. Blakely was an associate professor, whereas plaintiff was an assistant professor.

Plaintiff conceded she should be compared to Dr. Harrell Smith, full professor and Head of the Department of Agricul-

ture. Dr. Smith began working for UMES sixteen years before plaintiff was hired. Despite his length of service and higher rank, Dr. Smith and Dr. Monroe-Lord received wholly comparable salaries from 1980 to 1983. Defendants' Exhibit 59.

Plaintiff offered no analysis of the salaries she detailed above, nor of the budgets she submitted into evidence, and the Court concludes that plaintiff's faculty position is not comparable to the professors she chose for comparison. *Wilkins v. Univ. of Houston, supra,* 654 F.2d at 402. Thus, she has failed to establish that she was discriminated against in compensation.

### ii. *Smith*

Plaintiff Smith contends she has been paid less than her male peers since the early 1970's. Dr. Leon Coursey testified that in 1973, he believed, as head of the Physical Education Department, that plaintiff's salary was substantially less than it should have been in light of her responsibilities. Plaintiffs' Exhibit 131 at 6–8. As a consequence, Dr. Coursey gave plaintiff merit increases in recognition for her work. *Id.* at 9.

For purposes of salary, plaintiff compares herself with Kirkland Hall, instructor in the Physical Education Department; Ernest Satchell, assistant professor and, at one time, Acting Head of the Department of Fine Arts; and Ray Ferrante, assistant professor of English. All three men possess the masters degree, as does plaintiff. Hall was hired in 1980. Satchell came to UMES in 1971 and received tenure in 1980. Ferrante joined the campus in 1969 and was tenured in 1976. Plaintiff testified that their salaries compare as follows:

| Fiscal Year | Smith | Hall | Satchell | Ferrante[**] |
|---|---|---|---|---|
| 1980–81 | $18,748 | $16,000 | $18,500[*] | $19,900 |
| 1981–82 | 19,123 | 20,500 | 21,090[*] | 21,690 |
| 1982–83 | 21,226 | 20,650 | 21,510[*] | 22,016 |
| 1983–84 | 21,439[6] | 22,317 | 26,027 | 24,840 |
| 1984–85 | 21,651 | 25,000 | 27,068 | 25,858 |
| 1985–86 | 22,517 | 29,000 | 28,965 | N/A |
| 1986–87 | 23,868 | 30,700 | 30,900 | 31,400 |

[*] Plaintiff did not testify as to these three figures. The Court gleaned them from the UMES Budgets, Plaintiffs' Exhibit 84.

[**] Rather than testifying as to absolute numbers, plaintiff stated the differential between her salary and Ferrante's. The Court took these figures from the UMES Budgets, Plaintiffs' Exhibit 84.

---

The evidence reveals that plaintiff's salary was commensurate with the male faculty members' compensation until fiscal year 1983–84, her first year as lecturer following the termination of her assistant professor contract. Thereafter, neither her academic rank nor her discipline was comparable to Satchell or Ferrante.

As to Hall, plaintiff works under a ten-month contract, whereas Hall's salary is based on twelve months' work. Adjusting Hall's salary to a ten-month basis, his annual compensation from 1983 to 1986 would have been:

| | |
|---|---|
| 1983 | $18,598 |
| 1984 | 20,833 |
| 1985 | 24,167 |
| 1986 | 25,583 |

These figures are not substantially different from plaintiff's salary. Although Hall had significantly fewer years' service, he was an instructor during this period, while plaintiff was a lecturer. In 1983, Hall assumed the position of Athletic Director,

**6.** For the first half of 1983–84, plaintiff's salary was $21,226. During the second half, it increased to $21,651. Plaintiffs' Exhibit 102.

which carried additional administrative responsibilities. Plaintiff did not have similar responsibilities in this time period. Hall was also Director of the National Youth Sports Program.

Yearly salary increases are based on meritorious activity in teaching, service and scholarly productivity during the preceding year. Although plaintiff's department head recommended a substantial increase for Smith, Vice Chancellor Ellis denied the recommendation because, in his opinion, plaintiff had not pursued activities to merit such an increase. The Court is somewhat surprised by Ellis' conclusions, given that plaintiff was selected by UMES students as "Most Outstanding Teacher of the Year" in 1984–85, and her department head considered plaintiff the most important colleague in his department. Plaintiffs' Exhibit 151. However, plaintiff did not have any record of scholarly productivity or research during that year. *Id.*

Plaintiff testified that she requested leave in 1971 to complete her terminal degree, but she received no response to her request. She made additional requests later, but they were turned down because her department was short on faculty. Male professors, however, were apparently provided the opportunity to obtain higher degrees. While the Court has no reason to doubt the veracity of plaintiff's testimony, this comparison alone does not justify an inference of intentional discrimination. Plaintiff did not elaborate upon the circumstances surrounding the male faculty members' opportunities to finish their degrees. The Court does not know which departments they were in, what years they received their degrees, and what the circumstances were that enabled them to take leave. If the Court knew, for example, that their departments were also short of faculty, yet the men were still granted leave, then an inference of discrimination might be warranted. But plaintiff failed to provide the Court with such information.

The Court is concerned that plaintiff's application for tenure was overlooked several times in the late 1970's, and by the time she reapplied in December ₁979, more

stringent standards for tenure had been imported to the UMES campus. The fact that Smith's tenure application was continuously overlooked lends to an inference of discrimination. However, that inference is countered by plaintiff's testimony that several women received tenure as assistant professors in the period prior to 1980.

Although plaintiff has convinced the Court that she is a victim of circumstance, she has not met her burden that she was discriminated against. The facts indicate that plaintiff should have been granted tenure under the old system. Unfortunately, her application was delayed until the advent of more rigorous standards that she did not meet. If plaintiff had been awarded tenure under the old system, then she would still maintain the rank of assistant professor, and her salary would have risen accordingly. Her salary began to lag after she was denied tenure.

Plaintiff contends she is paid less than the male faculty in her department. Yet, after her tenure denial, she was demoted to the lowest instructional rank. Salaries vary according to rank, and plaintiff has not proven that the cause of her decline in rank was discriminatory.

The Court believes that plaintiff is a highly valued member of the Physical Education Department and a very effective teacher. If the Court were able to award backpay and an increased salary to plaintiff because of her dedication and years of service, it surely would. But the Court is only empowered to award damages when a party has proven intentional discrimination. In this case, plaintiff has failed to produce sufficient evidence to meet that burden.

## C. *Pregnancy Discrimination*

Monroe-Lord claims her termination in 1984 was impermissibly based on pregnancy. The pregnancy amendment to Title VII provides:

The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical condi-

tions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work....

42 U.S.C. § 2000e(k). Plaintiff can establish a prima facie case of discrimination by showing that she was terminated during the time she was pregnant. *Reeves v. Brand-Name Fashion Outlet,* 532 F.Supp. 32, 34 (W.D.Tenn.1982). The burden then shifts to defendant to articulate a legitimate reason for the employment decision, following which plaintiff has the opportunity to prove pretext.

 Plaintiff established a prima facie case of pregnancy discrimination because she was pregnant in the summer of 1984 when her contract terminated, and defendants failed to renew it. Defendants, however, successfully rebutted plaintiff's prima facie case. Monroe-Lord's contract as lecturer automatically terminated on June 8, 1984. Defendants' Exhibit 25. Plaintiff had previously applied for a tenure-track position, Plaintiffs' Exhibit 54, and she indicated she was not interested in a temporary contract. Defendants' Exhibit 32. Defendants declined to offer Monroe-Lord another tenure-track slot because she had previously been denied tenure. This justification is a legitimate reason for not offering plaintiff a contract in 1984.

Plaintiff testified that in May 1984, Hytche made harassing comments about her being pregnant, following which a notice of separation was prepared without her knowledge. Notices of separation are automatically prepared when a lecturer's contract nears its end, and lecturers are not entitled to notification of non-renewal. Defendants' Exhibit 25. In light of plaintiff's incredible testimony about Hytche sexually harassing her, the Court does not believe her testimony regarding the Chancellor's statement about her pregnancy.

Monroe-Lord also testified that during the summer of 1984, both Hytche and Ellis promised that she would receive a new contract for 1984–85. Hytche and Ellis testified to the contrary. The Court finds defendants' testimony more credible.

Plaintiff has failed to rebut defendants' legitimate reason for terminating her employment in 1984. Accordingly, she has not proven her claim of pregnancy discrimination.

### D. *Access to Files*

 Plaintiffs believe defendants discriminated against them by refusing to allow plaintiffs to review their promotion and tenure files shortly after they were denied tenure. Promotion and tenure evaluations, however, are highly confidential documents. UMES generally does not permit faculty to review these files. Plaintiffs presented no evidence that defendants allowed other faculty access to such information, but denied it to Monroe-Lord and Smith. Accordingly, plaintiffs have not shown that their inability to review the promotion and tenure files resulted from discrimination.

### III. 42 U.S.C. § 1981

Plaintiffs also pursued their discriminatory denial of tenure claims under 42 U.S.C. § 1981, which provides in pertinent part: "All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white persons."

 Three years is the appropriate limitations period under Section 1981. *Grattan v. Burnett,* 710 F.2d 160, 163 (4th Cir.1983), *aff'd,* 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984); Md.Cts. & Jud.Proc. Code Ann. § 5–101. Chancellor Hytche notified Monroe-Lord that she had been denied tenure and promotion on June 14, 1982. The statute of limitations began to run on that date. *Delaware State College v. Ricks, supra,* 449 U.S. at 258, 101 S.Ct. at 504. Chancellor Hytche notified Smith on June 30, 1982, whereupon the statute of limitations began to run on her claim. Plaintiffs instituted this action on July 22, 1985, beyond the three-year limitations period. Accordingly, their claims for denial of tenure under 42 U.S.C. § 1981 are time-barred.

Even if plaintiffs' § 1981 claims had not been time barred, they failed for insuffi-

ciency of proof. *See Gairola v. Va. Dept. of General Services,* 753 F.2d 1281, 1285–87 (4th Cir.1985) (analysis of proof is the same under Title VII and Section 1981).

## IV. CONCLUSION

For the foregoing reasons, plaintiffs have failed to prove their claims that defendants discriminated against them on the basis of either race or sex.

### ORDER

In accordance with the attached Memorandum, it is this 19th day of August, 1987, by the United States District Court for the District of Maryland, ORDERED:

1. That plaintiffs' complaint BE, and the same hereby IS, DISMISSED with prejudice;

2. That judgment BE, and the same hereby IS, ENTERED in favor of defendants; and

3. That a copy of this Memorandum and Order be mailed to counsel.